# IN THE SUPREME COURT OF IOWA

No. 20–0375

Submitted September 16, 2021—Filed November 23, 2021

**TRAVIS BOMGAARS, KYLE CROSS,
ANTHONY GOMEZ, JAMES HALL,
RAYMOND LABELLE, SHANE MILLETT,**
and **KELLY SAND,**

      Appellants,

vs.

**STATE OF IOWA,**

      Appellee.

---

Appeal from the Iowa District Court for Jasper County, Brad McCall, Judge.

Inmates appeal the dismissal of their consolidated applications for postconviction relief challenging the scheduling of sex offender treatment. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Appel, Waterman, McDonald, and Oxley, JJ., joined. Appel, J., filed a concurrence. McDermott, J., filed an opinion concurring in part and dissenting in part.

Philip B. Mears (argued) of Mears Law Office, Iowa City, for appellants.


Thomas J. Miller, Attorney General, and Nicholas E. Siefert (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

Several male inmates serving time for sex-related offenses are challenging what they believe to be a catch-22 in Iowa's prison system. To be considered meaningfully for parole, these inmates need to have completed the sex offender treatment program (SOTP). But because of limits on resources, this treatment has tended to be available only as the inmate nears his tentative discharge date. The inmates contend, among other things, that this circumstance violates their constitutional right to due process.

In considering this case, we emphasize that our job is not to approve or disapprove of how the State allocates resources in the prison system. We simply conclude that no constitutional violation has been established. The record shows that the Iowa Department of Corrections (DOC) has not postponed treatment in order to delay parole. The problem is simply one of numbers: there are more male sex offenders in Iowa's prison system than SOTP spots available. The DOC has been actively addressing the need for sex offender treatment by increasing the number of classes and counselors. The existing waiting list, which prioritizes admission to treatment based on tentative discharge date, is a reasonable way to decide when an offender gets admitted to treatment. Accordingly, we affirm the judgment of the district court denying the petitioners' applications for postconviction relief.

**I. Facts and Procedural History.**

**A. The Petitioners.** This case involves seven male offenders currently incarcerated for sex-related crimes at the Newton Correctional Facility (NCF).

Their sentences range from ten years to forty years. None of the sentences carry mandatory minimums. At the time of the September 2019 hearing in this case, the offenders had served between eighteen months and nine years on their respective prison sentences. Their tentative discharge dates varied from April 25, 2022, to September 16, 2030.

These offenders score at "low" or "low-moderate" risk of reoffending. Most of them have completed significant programming in prison. None, however, have completed SOTP. For this reason, and in some cases for other reasons having to do with the seriousness of the underlying offenses and the length of time served, the DOC has not yet recommended any of the petitioners for parole.

At the time of hearing, all seven offenders were on the waiting list to receive "track one" SOTP. That waiting list had 419 individuals on it. The petitioners occupied positions 209 (Kyle Cross), 326 (Anthony Gomez), 341 (Raymond LaBelle), 368 (James Hall), 377 (Kelly Sand), 382 (Shane Millett), and 392 (Travis Bomgaars). While this case was on appeal, Cross was moved off the waiting list and began SOTP.[1]

**B. How SOTP Is Scheduled.** The DOC uses the "Good Lives" curriculum for male offenders who undergo SOTP. The program is administered on four separate tracks: track one for offenders with a low to low-moderate risk of reoffending, track two for offenders with an elevated risk of reoffending, track three for sex offenders with special needs, and track four for Spanish speakers.

---

[1]Both sides agreed this information could be provided to the court.

As noted, all the offenders involved in this case were on the waiting list for track one, which had 419 persons. As of September 2019, the other three waiting lists had 191, 126, and 27 persons respectively.

Except for a small program for inmates with special medical needs at the Iowa Medical and Classification Center in Oakdale, all SOTP for men takes place at NCF. Treatment takes approximately three to four months, with track two treatment lasting somewhat longer than track one. At the time of hearing in this case, there were potential slots for 175 individuals to undergo SOTP at NCF at any given time. However, in the correctional system as a whole, some 1,600 male inmates needed to complete SOTP. Thus, as an inmate in this group of 1,600 got closer to his tentative discharge date, he would typically be transferred to NCF and put on one of the waiting lists.

At the time of the hearing, nine counselors were conducting SOTP at NCF. Two more counselors were in training and two were expected to be hired to bring the total to thirteen. It was expected that these additional counselors would increase the capacity of the DOC to conduct SOTP classes. Yet once these additional counselors were on board, the existing physical limits of NCF would be reached. The plan was for the two newest counselors to work evenings to maximize utilization of the available classroom space at NCF.

Typically, about two-thirds of participants complete SOTP successfully. Those who are removed from the program go through an administrative hearing that results in a negative earned time adjustment and a new tentative discharge date. They then return to the waiting list. In fiscal year 2019, 264 persons

successfully completed SOTP; the DOC anticipated that number would be higher in fiscal year 2020 because of the aforementioned increased staffing.

An offender's position on the waiting list is based on his tentative discharge date, with some adjustments. First, an offender without a special sentence of parole, such as an offender who was not technically convicted of a sex offense, receives a three-year advancement on the waiting list. Second, special arrangements have been made for offenders who had served twenty years or longer but had not received an opportunity for SOTP.

At the time of hearing, most track one offenders were starting SOTP at NCF about thirteen months before their tentative discharge date according to the petitioners' brief. Once the two additional counselors were on board, the DOC anticipated that it would be able to schedule SOTP for track one offenders about eighteen months before tentative discharge date.[2]

**C. Parole Review.** The Iowa Board of Parole (the Board) completes about 13,000 parole reviews per year. The DOC makes recommendations regarding parole. The recommendations are not binding, and the Board has the discretion to grant or deny parole regardless of the DOC's recommendation. However, the Board has followed DOC recommendations as to whether an inmate needs SOTP before release. Therefore, when the DOC has recommended SOTP prior to release, the Board will not grant parole until that treatment has occurred. The

---

[2]At the September 2019 hearing, the DOC witness agreed that SOTP can be more effective when it occurs shortly before the inmate is released and therefore is "fresh in mind." However, he denied that the DOC postpones treatment for that reason: "[N]obody is held, nobody is delayed."

Board does not order the DOC to provide treatment or interfere with DOC's scheduling of treatment.

The petitioners have received annual parole reviews. At each review so far, the DOC has not recommended release, and the Board has not granted release. In the most recent reviews, the Board has generally provided at least two reasons for not granting release: "DR7," a code for "seriousness of the crime and criminal history"; and "DR14," a code indicating that the inmate still needs to "[p]articipate in institutional programs," i.e., SOTP. For petitioner Cross, the Board identified DR14, but not DR7, as the reason for his continued incarceration.

**D. This Litigation.** Between May and July 2019, each of the petitioners filed for postconviction relief in Jasper County, where NCF is located. Each petition alleged that the State was wrongfully denying a liberty interest in parole. In particular, the petitions alleged that the DOC had created a "silent mandatory minimum sentence" by not making SOTP available until a male inmate was nearing his tentative discharge date, knowing full well that the Board would not consider an inmate for parole until treatment is complete. Some of the petitions also alleged unlawful sex discrimination between male and female sex offenders.

The State answered each petition without objecting to venue. On June 22, the district court entered an order consolidating the five cases that were then on file and appointing counsel for the petitioners. On July 1, the State moved to reconsider the order appointing counsel. The State argued that appointed counsel was not available under Iowa Code section 822.2(1)(*e*), the provision

under which the petitioners were asserting their claims. On July 23, the court set an evidentiary hearing on all seven petitioners' claims for September 18 at NCF.

Approximately a month later, on August 23, the State moved for change of venue, arguing that Iowa Code section 822.2(1)(*e*) claims had to be brought in the county where the defendant had been convicted or sentenced. The petitioners responded that objections to venue had been waived. In a September 9 ruling, the district court agreed with the petitioners and denied the motion.

A full-day evidentiary hearing took place on September 18. Each of the seven petitioners testified. In addition, testimony was received from Andrea Muelhaupt, the Board's parole liaison officer, and Sean Crawford, the DOC's associate warden of treatment in charge of SOTP.

On January 30, 2020, the district court entered a ruling denying relief. The court concluded as follows:

> While 2019 was the first year the prison was able to graduate more inmates from SOTP than the number of new committed inmates required to participate in SOTP, at current and projected staffing levels, it will certainly not be the last. Assuming there are a total of 1,600 inmates now classified for SOTP and 260 new SOTP inmate admissions annually, and also assuming the prison is able to process 600 inmates through SOTP each year, the prison will be able to provide SOTP for every inmate now on the waiting list, as well as every new admission, in less than four years. While it is possible the [DOC] has failed in the past to reasonably provide SOTP for inmates classified for the program, it is no longer failing in that responsibility.
>
> The Court specifically finds, based upon the evidence presented, the [DOC] is not currently unreasonably withholding SOTP from male inmates. Furthermore, the Court specifically finds the [DOC] method of ranking inmates on the SOTP waiting lists, utilizing the TDD [tentative discharge date], is the most logical and

> rational method of ensuring inmates will complete SOTP prior to being released from prison. As the State notes, "[i]nsofar as 'reasonable' means fair, logical, sensible, or of sound judgment, it is hard to conceive of a more reasonable practice than that currently employed by the [DOC]. In fact, the practice of sequencing placement of inmates into SOTP based upon the impartial order of their discharge dates may be, literally, the most reasonable practice possible."

Thus, the court found it significant that the DOC was using a "logical and rational method" for allocating SOTP placements as they became available while also reducing the backlog of inmates awaiting SOTP. As the court put it, "The issue now before the Court . . . is not whether the [DOC] has reasonably made SOTP available to male inmates in the past; the issue before the Court is what the State is currently doing to see that the male prison population receives adequate access to required SOTP."

The court also rejected the petitioners' gender discrimination claim. It found that men and women were not similarly situated as to SOTP because "there are literally hundreds of male inmates in need of SOTP" and only a "handful of women inmates in need of SOTP," thus allowing women to be placed in SOTP soon after their arrival in prison.

Finally, the district court granted the State's timely motion for reconsideration and found that the petitioners were not entitled to appointed counsel. The court went on to say,

> Attorney Mears was aware at the time of his appointments the Court might reach this conclusion and agreed to accept the appointments with that understanding. Attorney Mears was an outstanding and zealous advocate for his clients in this case. His involvement in the case greatly facilitated the presentation of the facts, as well as this Court's consideration of the law.

The petitioners filed a motion to amend and enlarge the court's ruling. This motion was denied, and a timely appeal followed. We retained the appeal.

## II. Standard of Review.

Postconviction relief proceedings are normally reviewed for errors at law. *Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021). However, "[o]ur review is de novo '[w]hen the basis for relief implicates a violation of a constitutional dimension.'" *Id.* (second alteration in original) (quoting *Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018)).

## III. Legal Analysis.

On appeal, the petitioners assert they have a liberty interest in parole, which the DOC has violated by unreasonably withholding SOTP from them. In addition, the petitioners argue that the delay in administering SOTP and the impact of that delay on their sentences have abridged separation of powers and a related but distinct concept they refer to as "separation of function." Lastly, the petitioners argue the district court erred in denying their request for appointed counsel at state expense.[3]

As a preliminary matter, the State contends that six of the seven inmates do not have ripe cases because they have not established that lack of SOTP is the only reason they have not yet been paroled. *See State v. Tripp*, 776 N.W.2d 855, 859 (Iowa 2010). These six inmates have received, in addition to a DR14 denial code ("need to complete recommended interventions"), a DR7 denial code

---

[3]The petitioners do not pursue their gender discrimination claim on appeal.

("The seriousness of your crime or your criminal history indicates more time is needed before the Board will be convinced a release would be in the best interest of you or society.").

We have determined we should proceed to the merits. The State does not dispute the ripeness of one inmate's claims. Moreover, this case, as presented to us, is not inmate-specific. Rather, it challenges the overall policy by which DOC schedules SOTP in the prison system. The State does not dispute that DOC's policy delays parole in at least some instances. Yet in reviewing that policy, we should be mindful that the record does not show it delays parole for every sex offender, even excluding those offenders who fail to complete SOTP.

**A. Do the Petitioners Have a Liberty Interest in Parole?** Iowa Code section 906.4(1) (2019) provides,

> A parole or work release shall be ordered only for the best interest of society and the offender, not as an award of clemency. The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.

Based on the mandatory wording of the statute, i.e., "shall release," the petitioners contend they have a constitutionally protected liberty interest in parole.

In *Board of Pardons v. Allen*, the United States Supreme Court considered a Montana law that provided as follows:

> (1) Subject to the following restrictions, the board shall release on parole . . . any person confined in the Montana state prison or the women's correction center . . . when in its opinion there is

> reasonable probability that the prisoner can be released without detriment to the prisoner or to the community[.]
>
> . . . .
>
> (2) A parole shall be ordered only for the best interests of society and not as an award of clemency or a reduction of sentence or pardon. A prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding citizen.

482 U.S. 369, 376–77 (1987) (omissions and alteration in original) (quoting Mont. Code Ann. § 46-23-201 (1985)). The Court found that the Montana statute created a liberty interest protected by the Due Process Clause of the Fourteenth Amendment because it used mandatory language to establish a presumption of release when certain findings were made. *Id.* at 377–78, 381.

Iowa's parole statute is similar to Montana's. We made this observation a few years ago in *Belk v. State*, 905 N.W.2d 185, 190 (Iowa 2017) ("*Allen* is an important case because the language of the applicable Montana statute in that case resembles that of the relevant Iowa statute."). In *Belk* we didn't actually conclude that Iowa Code section 906.4(1) establishes a liberty interest in parole, but we seemingly laid the groundwork for that conclusion. *See id.* ("From *Greenholtz* [*v. Inmates of the Nebraska Penal and Corrections Complex*, 442 U.S. 1 (1979),] and *Allen*, a court can conclude if the statute mandates that a parole board must release an inmate if the inmate meets certain statutorily created criteria, then a protected liberty interest in parole exists.").

In *Belk*, an inmate alleged "it was the policy of [DOC] to delay his access to SOTP until he was close to his tentative discharge date." *Id.* at 187. The inmate "further contended he is currently eligible for parole but has no meaningful

chance for parole unless the [DOC] recommends parole without the SOTP prerequisite." *Id.* The district court denied the inmate's postconviction relief application without reaching the merits, and we reversed. *Id.* at 188, 192. The specific holding of *Belk* was that "an inmate may proceed under Iowa Code section 822.2(1)(*e*) when alleging an unconstitutional denial of his or her liberty interest based on the [DOC's] failure to offer SOTP when SOTP is a necessary prerequisite to parole." *Id.* at 191.

The opinion concurring in part and dissenting in part argues that *Allen* is no longer good law and has been overruled *sub silentio* by *Sandin v. Conner*, 515 U.S. 472 (1995). That is a misreading of precedent. *Sandin* actually *reaffirmed Allen*, stating, "[W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. *See also Board of Pardons v. Allen*, 482 U.S. 369, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987)." *Id.* at 483–84.

*Sandin* was a case about prison discipline, and the Supreme Court criticized *Hewitt v. Helms*, 459 U.S. 460 (1983), an earlier prison discipline case, for recognizing a liberty interest in prison conditions based on prison regulations. *Sandin*, 515 U.S. at 481–83. Following *Sandin*, in *Swarthout v. Cooke*, 562 U.S. 216, 216 (2011) (per curiam), the Supreme Court once again addressed parole— not prison discipline. The *Swarthout* opinion was per curiam and unanimous. *Id.* The Supreme Court pointed to the United States Court of Appeals for the Ninth Circuit's determination that "California law creates a liberty interest in parole." *Id.* at 219. It characterized that determination as "a reasonable

application of our cases. *See Board of Pardons v. Allen*, 482 U.S. 369, 373–381, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987); *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1, 12, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979)." *Id.* at 219–20. Thus, *Allen* clearly remains the law as to when a parole statute creates a liberty interest.[4]

In light of Iowa Code section 906.4(1), *Allen, Sandin, Swarthout,* and *Belk*, we conclude that the petitioners have a liberty interest in parole protected by the Due Process Clause of the Fourteenth Amendment and article I, section 9 of the

---

[4]The opinion concurring in part and dissenting in part considers the *Swarthout* language "more equivocal." However, it is logical to conclude the Supreme Court used the phrase "reasonable application" because it is the standard dictated by federal habeas law:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1) (emphasis added).

*Sandin* also implicitly recognized that its core holding would not apply if the prison officials' action "will inevitably affect the duration of [the prisoner's] sentence"—precisely the situation that is alleged in this case. 515 U.S. at 487.

The opinion concurring in part and dissenting in part also relies on *Wilkinson v. Austin*, a case decided between *Sandin* and *Swarthout*. *See* 545 U.S. 209 (2005). *Wilkinson* found that Ohio prisoners had a liberty interest in not being placed in Ohio's "Supermax" prison as opposed to another less restrictive prison setting. *Id.* at 224. *Wilkinson* does not even mention *Allen*, let alone undermine its reasoning.

Furthermore, the Supreme Court has made clear that other courts are not free to conclude that applicable Supreme Court precedent has been overruled "by implication":

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini v. Felton*, 521 U.S. 203, 237 (1997) (alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). This court is not at liberty to anticipatorily overrule Supreme Court precedent any more than lower courts in Iowa are at liberty to anticipatorily overrule this court's precedent.

Iowa Constitution. The petitioners are correct that the Iowa parole statute uses mandatory language. *See* Iowa Code § 4.1(30)(*a*) ("The word 'shall' imposes a duty."); *State v. Roby*, 897 N.W.2d 127, 158 (Iowa 2017) (Zager, J., dissenting) ("[T]he board is obligated to release an individual as soon as the individual is rehabilitated.").[5]

**B. Has That Liberty Interest Been Violated?** The next question is whether DOC has unconstitutionally violated that liberty interest by denying SOTP to the petitioners.

The United States Supreme Court has held that even when state law creates a liberty interest in parole, the Due Process Clause of the Fourteenth Amendment requires only "minimal" procedures, including an opportunity to be heard and a statement of reasons why parole was denied. *See Swarthout*, 562 U.S. at 220; *see also Belk*, 905 N.W.2d at 189 n. 1 ("The due process protections afforded for an inmate's liberty interest in parole [are] minimal."). The Supreme Court has also held that prison discipline does not trigger the Due Process Clause unless it involves an "atypical, significant deprivation" or will

---

[5]It is unclear whether the petitioners are relying on the United States Constitution, the Iowa Constitution, or both, for their due process arguments. Below they argued,

> Any constitutional claim for due process . . . is submitted both based on the United States Constitution and the comparable provisions found in the Iowa Constitution. To the extent that the United States Constitution does not reach the claimed behavior of the Department of Corrections, the Court should still look at the Iowa Constitution and its comparable provisions to see if they provide greater protections.

No such statement appears in the appellate briefing, which is nonspecific about the textual source of petitioners' claim. The briefing does, however, discuss caselaw applying both federal and state constitutional provisions. *See, e.g.*, *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 767 (Iowa 2019). Accordingly, we will apply the federal framework while reserving the right to apply it in a fashion different from federal caselaw. *See State v. Lilly*, 930 N.W.2d 293, 301 (Iowa 2019). The district court followed the same approach below.

"inevitably affect the duration of [the inmate's] sentence." *Sandin*, 515 U.S. at 486–87.

This case does not involve procedural due process. The procedural standards for the grant or denial of parole are set forth by statute, rule, and Board practice. *See* Iowa Code §§ 906.3, .5; Iowa Admin. Code rs. 205—8.1–.16. For example, the Board normally considers only information that has been reviewed by the inmate. Iowa Admin. Code r. 205—8.11. The inmate has the opportunity to respond to the information. *Id.* r. 205—8.11(2). The inmate is notified when the inmate is to be interviewed and has "ample opportunity to express views and present materials." *Id.* rs. 205—8.8, .12. The inmate receives notice of the parole decision. *Id.* r. 8.16. The petitioners do not challenge those standards. The petitioners claim, rather, that they have a substantive right to SOTP earlier than it is currently provided by the DOC.

As we discuss below, we have concluded that we need not decide today whether the Due Process Clause affords an Iowa inmate *any* substantive right to receive SOTP at a particular time. Regardless, we find that DOC's current schedule for delivering SOTP is reasonable under the circumstances and meets federal and state due process requirements.

1. *Caselaw from other jurisdictions*. As a general proposition, prisoners do not have a constitutional right to rehabilitative services. *See, e.g., Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 748 (10th Cir. 2013) ("[T]he option to participate in a rehabilitative program like SOTP is a privilege, not a right."); *Abraham v. Del. Dep't of Corr.*, 331 F. App'x 929, 931 (3d Cir. 2009) ("Prisoners

have no constitutional right to drug treatment or other rehabilitation."); *Brown v. Chandler*, 111 F. App'x 972, 976 (10th Cir. 2004) ("Brown does not have a vested right to participate in the SOTP as a matter of federal [constitutional] law."); *see also Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (explaining that with regard to eligibility for rehabilitative programs in the federal prison system, Congress has given federal prison officials full discretion and "petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process").

Although the Supreme Court has not addressed when rehabilitative programs must be provided to a prisoner with a liberty interest in parole in order to satisfy substantive due process, it is logical to conclude from cases like *Swarthout* that states have significant leeway. Recently, in *People ex rel. Johnson v. Superintendent*, New York's highest court indicated that even "when a State adopts a sentencing scheme which creates a legitimate expectation of early release from prison," any judicial review of prison officials' conduct for substantive due process purposes is a limited, rational-basis review. 163 N.E.3d 1041, 1050–51 (N.Y. 2020) (quoting *Russo v. N.Y. State Bd. of Parole*, 405 N.E.2d 225, 227 (N.Y. 1980)). Specifically, the court stated, "The applicable standard of review of Johnson's due process claim is, then, the rational basis test, not strict scrutiny."

A number of courts have recognized that prison officials can limit admission to SOTP based on their limited resources. *See, e.g., Wakefield v. Fischer*, 968 N.Y.S.2d 255, 256 (N.Y. App. Div. 2013); *Sullivan v. S.C. Dep't of*

*Corr.*, 586 S.E.2d 124, 127 (S.C. 2003); *State v. Howard*, 539 A.2d 1203, 1212–13 (N.J. 1988); *Eldridge v. Oliver*, No. 16–CV–00690–MSK, 2017 WL 2812824, at *7 (D. Colo. June 29, 2017); *Watkins v. Hardison*, No. 36859, 2010 WL 9589130, at *6 (Idaho Ct. App. July 14, 2010); *Ramos v. N.H. Dep't of Corr.*, No. 15–cv–261–JD, 2015 WL 6554564, at *2 (D.N.H. Oct. 29, 2015).

In *Wakefield v. Fischer*, a New York intermediate appellate court held that the decision to delay an inmate's participation in SOTP was not arbitrary where, given the limited resources available, the state had developed guidelines for administering SOTP based on an inmate's release date. 968 N.Y.S.2d at 256. The petitioner argued that his request to transfer to another facility that offered SOTP had to be granted to afford him any meaningful opportunity for parole. *Id.* at 255–56. The court, however, held that guidelines for administering SOTP based on an inmate's release date were not arbitrary or capricious. *Id.* at 256. The court explained,

> [New York's department of corrections] has developed guidelines for administering sex offender treatment programs throughout the state. The guidelines recognize the need to allocate limited resources and provide that inmates shall be placed in sex offender treatment programs "as they get closer to their release date." The guidelines provide that moderate to high risk participants, such as petitioner, are admitted to such programs 36 months prior to their conditional release date.
>
> Determining when an inmate can most benefit from participation in SOCTP given the limited therapeutic resources available in the prison setting is the type of matter that falls squarely within [the New York department of corrections'] discretionary authority.

*Id.*

In a similar vein, the United States District Court for the District of Colorado determined a prison's decision to deny parole to an inmate who had not had the opportunity to complete SOTP required by his parole guidelines was not arbitrary or capricious. *See Eldridge*, 2017 WL 2812824, at *6. The inmate had no chance to participate in SOTP because it was wholly unavailable at the prison. *Id.* The inmate claimed that the Commission's denial of his parole was arbitrary and capricious because it was based on his failure to complete SOTP to which he did not have access. *Id.* at *7. The court ruled that this argument lacked merit: "[T]he BOP is not obligated to prioritize his facility designation to ensure such availability, and the Commission may reasonably consider the lack of sex offender treatment in its decision to deny parole." *Id.* Further, the court emphasized the importance of SOTP completion and its relatedness to an inmate's safe release to the community:

> The fact that a sex offender treatment program was unavailable at [the facility] does not preclude the Parole Commission from taking into consideration the fact that Petitioner had not completed such a program. The Parole Commission has neither the authority nor the obligation to assure that programs designed to improve the prospect of successful rehabilitation, and consequently safeguard the community, are provided by corrections authorities. It is the Parole Commission's responsibility to assess the risk posed by a parole applicant, and completion of an appropriate treatment program is rationally related to the assessment of that risk, regardless of the availability of appropriate programming where the inmate is housed.

*Id.* (quoting *Turnage v. Bledsoe*, No. 3:08–CV–1662, 2010 WL 3632699, at *7 (M.D. Penn. Sept. 9, 2010)).

Some of these decisions have specifically considered—and rejected—due process arguments. In *Watkins v. Hardison*, the Idaho Court of Appeals rejected

a prisoner's argument that he had "a right to sex offender rehabilitation at his request such that delay in admitting him to such rehabilitation implicates a due process right." *Watkins*, 2010 WL 9589130, at *3. The prisoner had been told that his "lack of any sex offender programming" was one reason for denial of his parole. *Id.* at *1. When the prisoner attempted to enroll in SOTP, he was placed on a waiting list. *Id.* The court held that an inmate placed on a waiting list because he is considered "low priority" due to his release date did not suffer an invasion of his liberty interest. *Id.* at *4. Rather, the waiting list indicated that the inmate would eventually receive SOTP when the resources allowed. *Id.* It should be noted, though, that Watkins "d[id] not have a liberty interest in being granted parole" under Idaho law. *Id.* at *3.

In another case, the South Carolina Supreme Court considered whether delay of SOTP violated a prisoner's liberty interest in parole. *Sullivan,* 586 S.E.2d at 127. In *Sullivan v. South Carolina Department of Corrections*, the prisoner filed an inmate grievance form after he was denied admission to the second phase of his SOTP based on the unavailability of bed space. *Id.* at 125. Given that the prison facility had fewer beds than inmates who needed SOTP, the prisoner was unable to access the program until it was his turn to receive a bed. *Id.* The court upheld the denial of admission, stating that although there is a liberty interest in rehabilitation, it is limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 126 (emphasis omitted) (quoting *Sandin,* 515 U.S. at 484). The

court, in other words, treated the denial of SOTP as a "condition of confinement claim" governed by *Sandin. Id.* at 127.

And in yet another case, the United States District Court for the District of New Hampshire found that an inmate's "loss of an opportunity for conditional release before his sentence maximum date, because of a delay in admitting him to the sex offender treatment program, does not implicate the Due Process Clause." *Ramos*, 2015 WL 6554564, at *2. It should be noted, however, that "New Hampshire has not created a liberty interest in the opportunity for parole." *Id.*; *see also Smith v. Heyns*, No. 2:12–CV–11373, 2013 WL 1163172, at *10–11 (E.D. Mich. Jan. 10, 2013) (finding no due process violation in the plaintiff's termination from SOTP given that Michigan's parole statutes "do not give rise to a protected liberty interest" and "plaintiff has no constitutional right to participate in any prison rehabilitation programs"); *Martin v. Clements*, No. 10–cv–03139–RBJ–CBS, 2011 WL 6968160, at *3–5 (D. Colo. Nov. 28, 2011) (rejecting an equal protection claim by an inmate who was not prioritized on the SOTP waiting list due to the type of sentence he was serving).

Finally, in the case perhaps most analogous to ours, the New Jersey Supreme Court rejected the due process claim of an inmate who had been ordered to complete SOTP in order to be eligible for parole but could not immediately transfer to the necessary facility due to severe overcrowding. *See Howard*, 539 A.2d at 1206, 1213. This inmate had been placed on a waiting list until resources allowed him to transfer and begin treatment. *Id.* at 1206. The court did not accept the inmate's argument that "the failure to treat him more

promptly, with its assumed delay on his evaluation for parole, violated his rights of substantive due process under the fourteenth amendment to the United States Constitution and article I, paragraph 1 of the New Jersey Constitution." *Id.* at 1213. The court observed,

> In a more perfect world, defendant's rehabilitative treatment would have started earlier. Defendant has never contended, however, that he was singled out for punitive treatment. He was, in a sense, a victim of the limited resources available to treat persistent sex offenders. The Commissioner, for his part, did as well as he could with the limited resources at Avenel.

*Id.* at 1212–13.

Outside the SOTP context, courts have found that states may reasonably allocate resources for rehabilitative programs. *See, e.g.*, *State v. Evans*, 506 A.2d 695, 697–98 (N.H. 1985) (finding that a prisoner had no right under federal and New Hampshire law to funding for education that would demonstrate the progress required for early release). Rehabilitative programming itself, even programming necessary to fulfill conditions that would permit early release, has no absolute federal constitutional significance. *Id.* In *State v. Evans*, an inmate housed in New Hampshire argued that he had a constitutionally protected right to receive the funding necessary for education needed for early release. *Id.* at 696–97. The court ruled otherwise:

> [T]he right to rehabilitation under the Federal Constitution merely guarantees freedom from confinement in conditions that cause degeneration. Although rehabilitation is a primary goal of incarceration, the failure of a prison to provide an affirmative rehabilitation program, of itself, has no constitutional significance.
>
> . . . .

. . . Absent a violation of an inmate's rights, the judiciary may not interfere with the exercise of this discretion by ordering the prison to provide a particular educational program.

*Id.* at 697–98 (citations omitted).

The Vermont Supreme Court came to a similar conclusion in *Nash v. Coxon*, 583 A.2d 96 (Vt. 1990). In that case, an inmate requested that the state's corrections department provide funding for him to complete his paralegal education. *Id.* at 96. The court ruled that "[t]here is a considerable difference between a facility with virtually no educational or rehabilitative program . . . and one that has a reasonable selection of such programs but declines to expend funds to add new options requested by specific inmates." *Id.* at 98.

The United States Supreme Court has cautioned that absent a violation of inmates' rights, there should not be judicial interference with funding and discretion regarding programming offered. *Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.").

2. *This court's* Bonilla *decision.* Recently, we discussed whether rehabilitative services needed for parole must be provided to prisoners who committed their crimes as *juveniles. See Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 786 (Iowa 2019). In *Bonilla v. Iowa Board Parole*, the petitioner had committed first-degree kidnapping at the age of sixteen and was sentenced to life without parole. *Id.* at 758. His sentence was later modified after *Graham v. Florida*, 560 U.S. 48 (2010), to life with parole. *Bonilla*, 930 N.W.2d at 758. Yet

the petitioner was thereafter denied parole, in part because of his failure to complete SOTP. *Id.* at 759–62. Part of the petitioner's claim for relief was that denial of access to SOTP deprived him of any meaningful or realistic opportunity for release. *Id.* at 785–86. We declined to grant the petitioner relief against the Board, but we added,

> If the state, through the Board, wishes to condition release upon successful completion of certain programing such as SOTP, the department of corrections cannot unreasonably withhold such programming from a juvenile offender. Otherwise, the state could effectively deprive a juvenile offender of a meaningful opportunity to show maturity and rehabilitation by establishing release criteria that the state prevents the juvenile offender from meeting. The department of corrections does not have a pocket veto over the release of a juvenile offender through the withholding of services required by the Board for the release of a juvenile offender.

> It may be, however, that the Board has limited direct authority over the department of corrections. If the department of corrections fails to act reasonably in light of the communication from the Board regarding programming, the juvenile offender may file a claim against the department under Iowa Code chapter 822, alleging that by denying reasonable access to the programming necessary to obtain an opportunity for release, the state is failing to live up to the requirements of *Graham–Miller*.

*Id.* at 786; *see also Belk*, 905 N.W.2d at 191. In short, *Bonilla* indicated that the State cannot deprive an incarcerated juvenile offender of the opportunity for parole by "unreasonably" withholding SOTP. *Id.*

3. *Resolving the issue in this case.* We need not decide today what, if any, obligations are imposed on prison officials by substantive due process when incarcerated adult sex offenders need to complete SOTP as a condition of parole. Certainly, the Due Process Clause requires *no more than* the reasonableness

standard we referred to in *Bonilla* and that the district court applied in this case. Nor do any of the out-of-state cases suggest a higher standard.

On our de novo review, we agree with the district court that the record shows DOC's current practices with regard to SOTP are reasonable. DOC has increased staffing to offer more SOTP classes so that thirteen classes are being offered at any given time and the physical limits of NCF have been reached. This has resulted in meaningful, ongoing progress in reducing waiting list times.[6] While there are various ways to sequence a waiting list, it appears that DOC's decision to base the waiting list on tentative release date is fair and reasonable. This is the same approach upheld by the New York appellate court in *Wakefield* and the Idaho appellate court in *Watkins*. It protects Iowa inmates from losing out on earned time credits they would otherwise receive from successfully completing SOTP. *See* Iowa Code § 903A.2(1)(*a*)(2).[7]

For the most part, the petitioners do not challenge how DOC manages its SOTP waiting lists. Instead, they offer several proposals, all thoughtful but none in our view legally warranted in the present case. First, they suggest that certain low-risk individuals could perform their SOTP in the community after release. However, it is for the Board to decide when an inmate "shall be released." *See*

---

[6]The petitioners contend that the district court's math is incorrect and that it will take much more than four years to eliminate the wait list. In particular, they contend the court has failed to take into account special sentence revocations. But regardless of the exact numbers, it remains undisputed that DOC is making progress in reducing the backlog.

[7]It is also important to note that our precedents afford due process protections to an inmate *before* he is classified as needing SOTP. *See Dykstra v. Iowa Dist. Ct.*, 783 N.W.2d 473, 481 (Iowa 2010). This recognizes, in part, the impact that SOTP may have on the time the inmate spends in prison.

Iowa Code § 906.3 ("The board shall determine which of those persons who have been committed to the custody of the director of the Iowa department of corrections, by reason of their conviction of a public offense, shall be released on parole or work release."). If the Board believes an inmate can be properly and safely released to the community without having performed SOTP, it already has authority to do so. *See id.* § 906.4(1). Thus, the petitioners' first proposal asks us, in effect, to override the Board's judgment as to whether certain inmates can be safely released.

Even if that were appropriate, the present action is not directed at the Board. Inmates seeking review of a Board decision retain the right to file a petition for judicial review under Iowa Code section 17A.19(10). *See Johnson v. Dep't of Corr.*, 635 N.W.2d 487, 489 (Iowa Ct. App. 2001). This postconviction relief action is not the occasion for us to review parole decisions by the Board.

Second, the petitioners suggest that we could tell the Board to instruct DOC to move up certain inmates on the SOTP waiting list. At present, the Board does not get involved in DOC's scheduling of SOTP. But again, a postconviction relief action is not the proper mechanism for reviewing how the Board exercises its parole authority. And regardless, the petitioners' proposal would not attack the fundamental problem, namely, the limited number of SOTP classes available. Even if this proposal were implemented, there would still be a waiting list and it would be just as long.

Third, the petitioners suggest that DOC could be ordered to expand existing SOTP so it is offered at other prisons. This, however, would put us in

the position of forcing the DOC to spend more money and hire more people. Just as the petitioners' first proposal would require us to substitute our own parole decisions for those of the Board, their third proposal would have us supplant the legislature's and the DOC's budgeting and management decisions. We do not believe any of the authorities discussed above would require such an extraordinary remedy.

Instead, the authorities discussed above demonstrate a general principle that state legislatures do not have a constitutional duty to provide funding to maximize opportunities for parole. Although Iowa inmates serving indeterminate sentences have a liberty interest in parole, any liberty interest is subject to reasonable limits on programming based on classroom space, availability of instructors, and other factors. The DOC has implemented a system that that is neither arbitrary nor capricious but rather determines eligibility for SOTP based on a measurable and consistent factor: the inmate's anticipated release date. The DOC has reasonably and strategically allocated funding to add instructors and schedule classes to allow as many inmates as possible to participate.

We affirm the district court's conclusion that the petitioners failed to establish an unconstitutional deprivation of due process.

**C. Is There a Separation of Powers Violation?** The petitioners maintain that the existing waiting list system for SOTP eligibility creates a "silent mandatory sentence," thereby violating the constitutional principle of separation of powers. *See* Iowa Const. art. III, § 1. In the petitioners' view, the judicial branch has been denied its constitutional power over sentencing because the executive

branch has dallied in providing SOTP, thereby transforming indeterminate sentences into sentences with de facto mandatory minimums.

We are somewhat puzzled by this argument. Sentencing laws, the Board's authority over parole, and the DOC's operation of prisons, including SOTP, are all matters within the purview of the legislature. *See Doe v. State*, 688 N.W.2d 265, 270–71 (Iowa 2004); *State v. Phillips*, 610 N.W.2d 840, 842–43 (Iowa 2000) (en banc). While the courts get to determine individual sentences, the longstanding rule is that they must do so without considering the Board's parole practices. *See State v. Bentley͵* 757 N.W.2d 257, 266 (Iowa 2008) ("[A] sentencing court impermissibly invades the prerogative of the parole board by considering the effect a sentence will have on a defendant's parole date."); *State v. Remmers*, 259 N.W.2d 779, 784 (Iowa 1977) (en banc).

If the legislative branch believes the executive branch is thwarting legislative intent with regard to the duration of sentences and the availability of parole for sex offenders, the legislature has tools to address the problem. In short, the situation described by the petitioners involves the executive branch overstepping legislative authority, not judicial authority. And there is no indication the legislative branch is incapable of reasserting itself over the executive branch if need be.

**D. Is There a "Separation of Function" Violation?** Next, the petitioners argue that there has been a "separation of function" violation between the DOC and the Board. We are not persuaded. Each of these two agencies has certain statutory responsibilities. The DOC is responsible for the "control, treatment,

and rehabilitation of offenders." Iowa Code § 904.102. The Board has its own set of functions, including "establish[ing] and implement[ing] a plan by which the board systematically reviews the status of each person who has been committed to the custody of the director of the Iowa department of corrections and considers the person's prospects for parole or work release." *Id.* § 906.5(1)(*a*). The petitioners cite no example of a statute that either agency has violated. The DOC has implemented a process for determining eligibility for SOTP by utilizing waiting lists based on tentative release date. This is within the DOC's authority because it relates to the control, treatment, and rehabilitation of inmates. In turn, the Board, exercising its authority, has deferred to the DOC's recommendation that an inmate not be released before completing SOTP.

**E. Are Petitioners Entitled to Appointed Counsel at State Expense?**
Finally, we need to decide whether the petitioners have a right to appointed counsel at state expense. Indigent prisoners are entitled to appointed counsel "[u]nless the applicant is confined in a state institution and is seeking relief under section 822.2, subsection 1, paragraphs '*e*' and '*f*.'" Iowa Code § 822.5. Here, the petitioners urge that their claims fall under Iowa Code section 822.2(1)(*a*), a provision that applies when "[t]he conviction or sentence" was unlawful or unconstitutional. Yet the petitioners are not challenging their underlying convictions or sentences; they are arguing that parole has been wrongfully delayed.

We specifically held in *Belk* that claims like those of the petitioners fall under section 822.2(1)(*e*) and not 822.2(1)(*a*). As we put it,

> [A]n inmate may proceed under Iowa Code section 822.2(1)(*e*) when alleging an unconstitutional denial of his or her liberty interest based on the [DOC's] failure to offer SOTP when SOTP is a necessary prerequisite to parole. That section applies when "the person is otherwise unlawfully held in custody or other restraint."

*Belk*, 905 N.W.2d at 191 (quoting Iowa Code § 822.2(1)(*e*) (2013)). We added that "section 822.2(1)(*a*) is inapposite because Belk is not complaining about his 'conviction or sentence.'" *Id.* at 192. We indicated that Belk's petition was subject to dismissal because it had been brought mistakenly under section 822.2(1)(*a*) but that Belk should be given an opportunity to amend and proceed under section 822.2(1)(*e*). *See id.*

The petitioners argue that we should reconsider this central holding of *Belk*. We decline to do so because we think it was correctly decided. Alternatively, the petitioners argue that they can proceed under Iowa Code section 822.2(1)(*c*) (2019) because they are asserting that "[t]he sentence exceeds the maximum authorized by law." We disagree with this contention. As the State points out, section 822.2(1)(*c*) is related to section 822.2(1)(*a*) in that it again requires the petitioners to be challenging their *sentence.* As we pointed out in *Belk,* that is not what these claims do. Accordingly, we hold the petitioners are not entitled to counsel at State expense. Like the district court, we acknowledge the significant contributions made by their pro bono counsel.

**IV. Conclusion.**

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

Christensen, C.J., and Appel, Waterman, McDonald, and Oxley, JJ., join this opinion. Appel, J., files a concurrence. McDermott, J., files an opinion concurring in part and dissenting in part.

**APPEL, Justice (concurring).**

I agree with the majority opinion that under the mandatory language of Iowa Code section 906.4, the plaintiffs here have a liberty interest in parole under *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12 (1979), and *Board of Pardons v. Allen*, 482 U.S. 369, 376 (1987). I agree that under Iowa law an inmate may bring a claim "alleging an unconstitutional denial of his or her liberty interest based on the [Iowa Department of Correction's (DOC)] failure to offer [sex offender treatment program (SOTP)] when SOTP is a necessary prerequisite to parole." *Belk v. State*, 905 N.W.2d 185, 192 (Iowa 2017). Finally, I agree that under the facts presented, the Iowa Department of Corrections (DOC) is not abridging the liberty interest through its rational provision of SOTP programming.

I write to emphasize four important caveats to the court's narrow opinion.

First, this is not a case where the DOC has refused to provide a program that is essential to the release of a class of inmates on parole. A total failure to provide programing necessary for a class of inmates to obtain release could be problematic. *Cf. Leamer v. Fauver*, 288 F.3d 532, 545 (3d Cir. 2002) (failure to supply program that is required for release on parole).

Second, there is nothing in the record to suggest that the DOC is arbitrarily excluding certain individuals or groups from treatment necessary for parole. Such a "pocket veto," to use the term utilized in *Bonilla*, would raise serious legal questions. *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 786 (Iowa 2019).

Third, there is no indication in the record that the Iowa Board of Parole (the Board) is not generally aware of the manner in which the DOC provides SOTP programming to inmates when considering parole to individual prisoners. Nor is there evidence that the Board objects to the manner in which the services are being provided to inmates as interfering with the exercise of its parole responsibilities.

Fourth, the case does not involve a juvenile offender. There is no claim that the DOC is unreasonably withholding access to programming necessary to obtain an opportunity for release and thereby failing to live up to the promise of *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012). *See also Bonilla*, 930 N.W.2d at 786. *See generally* Martin Gardner, *Youthful Offenders and the Eighth Amendment Right to Rehabilitation: Limitations on the Punishment of Juveniles*, 83 Tenn. L. Rev. 455 (2016); Sarah French Russell, *Review for Release: Juvenile. Offenders, State Parole Practices, and the Eighth Amendment*, 89 Ind. L.J. 373 (2014); Jennifer L. Weekley, *Civil Rights— From Negative Restriction to Affirmative Obligation: A Call for Massachusetts to Recognize a Right to Rehabilitation Beginning with Juvenile Offenders*, 38 W. New Eng. L. Rev. 221 (2016).

If any of the above circumstances were to be present, we would have a different case. But based on the record before us, I concur that the claim of the plaintiffs in this case fails as the DOC is currently proceeding rationally regarding its provision of SOTP programming.

**McDERMOTT, Justice (concurring in part and dissenting in part).**

The petitioners in this appeal assert that they have a statutory right to parole and that the State deprived them of procedural due process associated with that right by delaying their sex offender treatment. On the threshold question of whether inmates have a statutory right to parole, the majority today holds in the petitioners' favor. Since, in my view, the statute provides no right to parole in the first place, I respectfully dissent on this issue and would hold that the State's method for scheduling sex offender treatment doesn't even implicate, let alone violate, any due process protections.

It's undisputed that the constitution provides no right to parole. *State v. Cronkhite*, 613 N.W.2d 664, 667 (Iowa 2000) (en banc) ("There is no constitutional or inherent right to be conditionally released from prison prior to the expiration of a valid sentence."); *State v. Wright*, 309 N.W.2d 891, 894 (Iowa 1981) ("Neither does he have a constitutional right to parole."). The petitioners thus ground their claim for a parole right not in the Iowa or federal constitutions but in state law. In *Board of Regents of State Colleges v. Roth*, the United States Supreme Court held for the first time that due process protections apply not only to property interests but also to "liberty" interests. 408 U.S. 564, 571–72 (1972). A state can create a liberty interest, the Court determined, by providing an entitlement to certain benefits by statute. *Id.* at 577–78.

But the statute cited in this case to support the petitioners' liberty interest in parole, Iowa Code section 906.4, doesn't in fact create the entitlement to parole

that the petitioners urge (and that the majority finds). To have a protected liberty interest, one "clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. 577.

And it's in identifying some "entitlement" to create the claimed liberty interest that the petitioners' claim fails. For an inmate to be *entitled* to parole, the parole decision can't rest on the unfettered discretion of the state. Yet the statute in this case does exactly that. Here's the full text:

> The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.

Iowa Code § 906.4(1) (2019).

The markers of the discretion granted to the state in this statute are obvious and unadorned. The statute requires the board to parole an inmate "when in its opinion" (i.e., when in the *board's* opinion) the board finds a "reasonable probability" that the inmate can be released without detriment to the community or the inmate. The board's "opinion" about whether such a "reasonable probability" exists requires the board to consider and weigh probabilities for potential future events associated with the inmate's possible release and the impact it might have on both the community and the inmate. *Id.* This type of predictive exercise is inherently subjective. The second sentence of the statute continues in the same vein. In defining the phrase "detriment to the community or to the person," the legislature confers yet another layer of

discretion on the board, declaring that the phrase refers to a person "able and willing to fulfill the obligations of a law-abiding citizen, *in the board's determination.*" *Id.* (emphasis added). It's pure subjectivity stacked upon pure subjectivity—defining the criteria for the decision and then deciding whether the inmate meets that criteria are both wholly subjective endeavors.

The latitude granted the board in making parole decisions under section 906.4 is so expansive as to make decisions virtually unreviewable. If the board finds *in its opinion* that a *reasonable probability* to release the person without determent to the community *in the board's determination* does not exist, how does a reviewing body ever determine that an inmate has, in fact, satisfied the parole requirements? The statute offers no rubric, no objective reviewing standard that a body could apply to overturn a board decision denying parole. There's simply no way to show that the board erred in setting the criteria to establish "detriment to the community or the person" (which is, under the statute, "in the board's determination") and similarly has no way to show that the board erred in measuring whether the "reasonable probability" existed to satisfy that criteria (which is, after all, based only on "its opinion"). *Id.* Such a task would require psychic powers enabling a reviewer to peer into the minds of board members to decipher each individual's subjective weighing of risk probabilities and personal opinion about an inmate's ability and willingness to fulfill what the board members consider to be "the obligations of a law-abiding citizen."

A statute that requires supernatural powers to review whether a decision satisfies its criteria is not a statute that creates an "entitlement" to any particular decision. "[A] State creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). Agency action predicated on agency discretion isn't subject to judicial review if "no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Without a fixed line connecting the statute's decision criteria to a required outcome, the inmate can lay claim to no "entitlement" to an outcome and thus to no liberty interest bearing an associated right to procedural due process. *See Meachum v. Fano*, 427 U.S. 215, 223–24, 228 (1976) (holding an inmate's claimed right to remain at a particular prison "too ephemeral and insubstantial to trigger procedural due process protections" because of prison officials' broad discretion in transfer decisions).

The majority relies on the United States Supreme Court's 1987 decision in *Board of Pardons v. Allen*, 482 U.S. 369 (1987), for its holding that section 906.4(1) creates a protected liberty interest in parole. In *Allen*, the Court analyzed a Montana parole statute containing language that mostly mirrors Iowa Code section 906.4(1). *Id.* at 376. The Court held that inmates possessed a liberty interest in parole under Montana's statute because the word "shall" mandated

an inmate's release if the decisionmaker found the criteria had been met. *Id.* at 377–78.[8]

The Court in *Allen,* in analyzing Montana's parole statute, employed an analytical framework from a 1979 case called *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1 (1979). *Allen,* 482 U.S. at 373–81. In *Greenholtz,* the Court held that Nebraska's parole statute, which contained different language than Montana's parole statute, created a liberty interest that gave rise to due process protections because of the mandatory language that the board "shall" order release if certain criteria are met. 442 U.S. at 11–12. The Court in *Allen,* as it did in *Greenholtz,* held that inmates possessed a liberty interest in parole solely because the statute's inclusion of the word "shall" mandated a release notwithstanding the discretion afforded the decisionmaker. 482 U.S. at 377.

Three justices dissented in *Allen.* 482 U.S. at 381 (O'Connor, J., joined by Rehnquist, C.J., and Scalia, J.). They criticized the majority for "[r]elying on semantics and ignoring altogether the sweeping discretion granted to the Board" in the statute to find an entitlement to parole. *Id.* The dissenters contended that "the distinction between an 'entitlement' and a mere 'expectancy' must necessarily depend on the degree to which the decisionmakers' discretion is constrained by law." *Id.* at 382. This is because an inmate possesses "nothing

---

[8]Our court cited *Allen* favorably in *State v. Belk,* which dealt with whether inmates could pursue in a postconviction relief action the types of claims that the petitioners now bring. 905 N.W.2d 185, 190 (Iowa 2017). But we did not decide in *Belk* whether inmates have a liberty interest in parole created by Iowa Code section 906.4(1). *Id.*

more than a mere hope of receiving a benefit unless the decision to confer that benefit is in a real sense channeled by law." *Id.* Since the crucial inquiry turns on "whether a statutory *entitlement* is created," the court cannot "merely . . . point to the existence of some 'standard' " to establish a liberty interest when the statute provides no meaningful limit on the decisionmakers' discretion. *Id.*

Eight years later, in *Sandin v. Conner*, the Supreme Court criticized its reasoning in *Greenholtz*, *Allen*, and several other cases that focused on mandatory language in prison regulation statutes to find protected liberty interests in favor of inmates. 515 U.S. 472, 480, 483 (1995). By failing to focus its analysis on the nature of the deprivation in the earlier cases, the Court stated that its framework had "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Id.* at 481. The Court in *Sandin* denounced the mandatory language approach found in *Greenholtz* and *Allen*, in which inmates mined prison statutes for new liberty interests in regulations that were instead "designed to guide correctional officials in the administration of a prison." *Id.* at 481–82. The mandatory-language framework, according to the Court, thus created disincentives for states to codify prison management procedures and led to the over-involvement of the courts in the day-to-day management of prisons, "often squandering judicial resources with little offsetting benefit to anyone." *Id.* at 482. The Court sought to turn away from the mandatory language approach that had caused courts to ignore the nature of the interest that the state had purportedly

created in the statute in favor of a mechanical exercise in parsing individual prison regulations for words like "shall." *Id.* at 481, 483.

In *Sandin*, the Court recognized that states may, under certain circumstances, create liberty interests that are protected by the Due Process Clause. 515 U.S. at 472. But it noted that these interests would "be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483–84 (citations omitted). The Court found the disciplinary action at issue was but one among "a myriad of considerations" for the board to decide in granting parole and thus "simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.* at 487.

The majority cites *Swarthout v. Cooke*, 562 U.S. 216, 217 (2011) (per curiam), to suggest that the Supreme Court continues to endorse the analysis in *Greenholtz* and *Allen.* I find the Court's language in *Swarthout* more equivocal. In its per curiam opinion, the Court first noted that the United States Court of Appeals for the Ninth Circuit had held that California's statute created a liberty interest in parole and then stated, "While we have no need to review that holding here, it is a reasonable application of our cases." *Id.* at 219–20. So after making clear that it is not getting into the question of whether the statute actually created a liberty interest in parole, the Court follows with language noteworthy for what it does *not* say. The Court does not state that the finding of a liberty

interest was "compelled" by precedent or "required" under *Greenholtz* and *Allen*, or some similar mandated outcome. It instead calls the holding merely "reasonable," followed by a *see* signal to *Greenholtz* and *Allen*.

The majority in this case, relying on *Allen*, time-travels to the pre-*Sandin* era, focusing exclusively on the word "shall" in the statute and finding a liberty interest on that basis. Yet the majority discusses none of the language that follows the word "shall" and that infuses the board with the vast discretion to decide whether an inmate should in fact be paroled. Placing "shall" in front of criteria that permit unbridled freedom in exercising judgment does nothing to establish an *entitlement* to any outcome within the decisionmaker's realm under a full reading of section 906.4(1).

This isn't an exercise in overruling *Greenholtz* and *Allen* by implication, as the majority suggests we have. *Greenholtz* has been abrogated—expressly—by the Supreme Court itself. In *Wilkinson v. Austin*, the Court concluded that *Sandin* abrogated *Greenholtz*—the jurisprudential foundation upon which *Allen*'s holding relies—as to its mandatory language approach for finding a liberty interest in a prison regulation. 545 U.S. 209, 229 (2005). The Court declared this directly: "Although *Sandin* abrogated *Greenholtz*'s and *Hewitt*'s methodology for establishing the liberty interest, these cases remain instructive for their discussion of the appropriate level of procedural safeguards." *Id.*[9]

---

[9]Black's Law Dictionary defines "abrogate" as "[t]o abolish (a law or custom) by formal or authoritative action; to annul or repeal." *Abrogate*, Black's Law Dictionary (11th ed. 2019). Stated differently, to "*abrogate* something is to abolish or dispense with it." Bryan A. Garner, Garner's Dictionary of Legal Usage 619–20 (3d ed. 2011).

The majority responds in part that "*Wilkinson* does not even mention *Allen*, let alone undermine its reasoning." True, *Wilkinson* does not mention *Allen*. But that doesn't mean the abrogation of *Greenholtz*'s reasoning leaves *Allen*'s reasoning intact. The Court in *Allen* completely followed *Greenholtz*'s methodology for establishing a liberty interest based on the word "shall." We need to look no further than the final paragraph of the *Allen* opinion to see just how fully the Court relied on *Greenholtz*'s reasoning for its holding:

> **Here, as in *Greenholtz***, the release decision is "necessarily subjective . . . and predictive,"; **here, as in *Greenholtz***, the discretion of the Board is "very broad,"; **and here, as in *Greenholtz***, the Board *shall* release the inmate when the findings prerequisite to release are made. Thus, we find in the Montana statute, **as in the Nebraska statute**, a liberty interest protected by the Due Process Clause.

*Allen*, 482 U.S. at 381 (citations omitted) (bold emphasis added). One might struggle to find a judicial opinion that so thoroughly wraps itself in the reasoning of another opinion. Because the Court in *Allen* wholly adopted *Greenholtz*'s reasoning for its holding, an abrogation of *Greenholtz*'s reasoning necessarily abrogates *Allen*'s reasoning too.

Indeed, our own cases have recognized that *Sandin* abrogated *Greenholtz*. In *Dykstra v. Iowa District Court*, we applied not *Greenholtz* or *Allen* but *Sandin* and a pre-*Greenholtz* case, *Wolff v. McDonnell*, 418 U.S. 539 (1974), to analyze whether a prison statute created a particular claimed liberty interest. 783 N.W.2d 473, 482 (Iowa 2010). In citing *Greenholtz* on a separate issue (analyzing instances where lesser procedural safeguards are owed to inmates), we noted that *Greenholtz* had been "abrogated on other grounds by *Sandin*." *Id.* We noted

the same thing in *Reilly v. Iowa District Court,* 783 N.W.2d 490, 495 (Iowa 2010). In both *Dykstra* and *Reilly,* we applied *Sandin,* not *Greenholtz* or *Allen* or another mandatory-language-approach case, to determine when liberty interests of prisoners are implicated. *Dykstra,* 783 N.W.2d at 480; *Reilly,* 783 N.W.2d at 495. The "other grounds" upon which we noted *Greenholtz* had been abrogated in *Sandin* are the very grounds that the majority now relies on to support the holding in this case.

More than a decade before these cases, in *Sanford v. Manternach,* we applied the *Sandin* analysis—and not what we referred to as "intervening United States Supreme Court cases on this issue" that would include *Greenholtz* and *Allen*—in deciding whether an inmate possessed a liberty interest in good-time credits for which the State sought forfeiture as part of a disciplinary action. 601 N.W.2d 360, 365 (Iowa 1999). We focused in *Sanford* "on 'the nature of the deprivation' rather than on the 'language of a particular regulation.' " *Id.* at 365–66 (quoting *Sandin,* 515 U.S. at 481). We even distinguished an Eighth Circuit Court of Appeals case from 1996 that applied the same mandatory-language approach that the majority applies in this case:

> We respectfully disagree with the mandatory/discretionary analysis employed by the court of appeals to reach this conclusion because this analytical framework is simply not appropriate under *Sandin.*
>
> We now consider whether Sanford has a liberty interest, using the principles set forth in *Sandin* and *Wolff.*

*Id.* at 366.

Other federal and state courts have similarly declared that *Sandin* abrogated the mandatory language approach in *Greenholtz* and *Allen* for

determining whether a prison statute creates a protected liberty interest. *See, e.g.*, *United States v. Johnson*, 703 F.3d 464, 471 (8th Cir. 2013) (finding *Sandin*'s focus on "the nature of the deprivation" as opposed to mandatory language in the statute is the more appropriate analytical framework); *Hamm v. Latessa*, 72 F.3d 947, 954–55 (1st Cir. 1995) (reversing the district court's finding that a parole statute created a liberty interest based merely on the inclusion of "shall" and stating that "the tectonic plates have shifted" after *Sandin*); *McDermott v. Mont. Dep't of Corr.*, 29 P.3d 992, 996–97 (Mont. 2001) (recognizing that the "mandatory language/substantive predicate" test of *Allen* and *Greenholtz* had been abandoned in favor of the tests described in *Sandin*, *Wolff*, and *Meachum*).

The record shows that the board had over twenty "denial codes" tied to the reasons it might provide for denying parole. These denial codes include holding for psychological or medical evaluation, additional required or recommended treatment programs, an inmate's risk assessment, an inmate's behavior, prior involvement with drugs, extension of work release to demonstrate willingness to become a law-abiding citizen, or simply that the board "does not *feel* that a parole at this time would be in the best interests of society." (Emphasis added.) Each of these reasons—including the last—fits within the board's expansive discretion in the statute for deciding whether an inmate should be released. The statute might as well say, "Parole board, you shall release an inmate if, in your opinion, you think you should." This is simply not the stuff of "entitlement" giving rise to a protected liberty interest.

Our own court long ago held that *Sandin* abrogated the mandatory language approach (i.e., is there a "shall" in the statute?) that the majority applies today. *See Dykstra*, 783 N.W.2d at 480; *Reilly*, 783 N.W.2d at 495. We should continue to reject *Allen*'s mandatory language approach and apply *Sandin* (and thus our own cases) in analyzing the threshold question of whether the statute creates a liberty interest in parole. While I concur in the majority's holding in sections III.B and III.C that the petitioners have proved no violation of a liberty interest and no separation of powers violation in this case, I respectfully dissent from the holding in section III.A. The petitioners in the first place had no protected liberty interest in parole and thus could not have been denied any process to which they were constitutionally entitled.